# UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

_____

## DOCKETING STATEMENT

_____

Case Name:  Dine Citizens, et al. v. Office of Surface Mining, et al._____

Appeal No. (if available) :  __15-1191_____

Court/Agency Appeal From:  __U. S. District Court for the District of Colorado_____

Court/Agency Docket No.:  _12-cv-1275 JLK___District Judge:__John L. Kane_____

Party or Parties filing Notice of Appeal/Petition:_ The U.S. Office of Surface Mining Reclamation and Enforcement; Sally Jewell, in her official capacity as Secretary of the Interior; Al Klein, in his official capacity as Regional Director of U.S. Office of Surface Mining Reclamation and Enforcement (OSM), Western Region; Bob Postle, in his official capacity as Manager of the Program Support Division for the Western Region of OSM; Rick Williamson, in his official capacity as Manager of the Indian Programs Branch of the Western Region of OSM; and Mychal Yellowman, in his official capacity as Navajo Mine Team Leader in OSM._____

## I.    TIMELINESS OF APPEAL OR PETITION FOR REVIEW

### A.    APPEAL FROM DISTRICT COURT

1.    Date notice of appeal filed:_ June 5, 2015_____

   a.    Was a motion filed for an extension of time to file the notice of appeal?  If so, give the filing date of the motion, the date of any order disposing of the motion, and the deadline for filing notice of appeal:
   __ No_____
   _____

   b.    Is the United States or an officer or an agency of the United States a party to this appeal?  ___Yes_____

2.    Authority fixing time limit for filing notice of appeal:

| | |
|---|---|
| Fed. R. App. 4 (a)(1)(A) ____ | Fed. R. App. 4(a)(6) ____ |
| Fed. R. App. 4 (a)(1)(B) _X__ | Fed. R. App. 4(b)(1) ____ |
| Fed. R. App. 4 (a)(2)      ____ | Fed. R. App. 4(b)(3) ____ |
| Fed. R. App. 4 (a)(3)      ____ | Fed. R. App. 4(b)(4) ____ |
| Fed. R. App. 4 (a)(4)      ____ | Fed. R. App. 4(c)      ____ |
| Fed. R. App. 4 (a)(5)      ____ | |

3.      Date final judgment or order to be reviewed was filed and **entered** on the district court docket:   _April 8, 2015_____

4.      Does the judgment or order to be reviewed dispose of **all** claims by and against **all** parties? *See* Fed. R. Civ. P. 54(b).
_____Yes_____

**(If your answer to Question 4 above is no, please answer the following questions in this section.)**

      a.      If not, did district court direct entry of judgment in accordance with Fed. R. Civ. P. 54(b)? When was this done?
_____

      b.      If the judgment or order is not a final disposition, is it appealable under 28 U.S.C. • 1292(a)?   _____

      c.      If none of the above applies, what is the **specific** statutory basis for determining that the judgment or order is appealable?  _____

5.      Tolling Motions. *See* Fed. R. App. P. 4(a)(4)(A); 4(b)(3)(A).

      a.      Give the filing date of any motion under Fed. R. Civ. P. 50(b), 52(b), 59, 60, including any motion for reconsideration, and in a criminal appeal any motion for judgment of acquittal, for arrest of judgment or for new trial, filed in the district court:
_____None_____

      b.      Has an order been entered by the district court disposing of any such motion, and, if so, when?_____
_____

B.      **REVIEW OF AGENCY ORDER** (To be completed only in connection with petitions for review or applications for enforcement filed directly with

the Court of Appeals.)

1. Date petition for review was filed: _____

2. Date of the order to be reviewed: _____

3. Specify the statute or other authority granting the court of appeals jurisdiction to review the order: _____
_____

4. Specify the time limit for filing the petition (cite specific statutory section or other authority): _____
_____

C. **APPEAL OF TAX COURT DECISION**

1. Date notice of appeal was filed: _____
(If notice was filed by mail, attach proof of postmark.)

2. Time limit for filing notice of appeal: _____

3. Date of entry of decision appealed: _____

4. Was a timely motion to vacate or revise a decision made under the Tax Court's Rules of Practice, and if so, when? *See* Fed. R. App. P. 13(a) _____

II.     **LIST ALL RELATED OR PRIOR RELATED APPEALS IN THIS COURT WITH APPROPRIATE CITATION(S).**  If none, please so state.

No. 15-1126, Dine Citizens Against Ruining Our Environment v. U.S. Office of Surface Mining Reclamation & Enforcement (appeal by the Navajo Transitional Energy Company, Intervenor-Defendant, from same final judgment).

Dine Citizens Against Ruining Our Environment v. Klein, 439 Fed. Appx. 679 (10th Cir. 2011)

III.     **GIVE A BRIEF DESCRIPTION OF THE NATURE OF THE PRESENT ACTION AND RESULT BELOW.**

        Plaintiffs challenged the decision of the Office of Surface Mining Reclamation and Enforcement ("OSM") to approve the Navajo Transitional Energy Company's Permit Revision Application for mining at the Navajo Mine, specifically challenging the adequacy of the Environmental Assessment prepared pursuant to the National Environmental Policy Act.  The district court sustained that challenge and vacated the approval decision.

IV.     **ISSUES RAISED IN THIS APPEAL.**

        Whether the Environmental Assessment prepared by OSM took the necessary hard look at environmental impacts pursuant to NEPA, and if not, whether the district court should have left the Permit Revision approval in place while the agency cured the deficiency.

V.      **ADDITIONAL INFORMATION IN CRIMINAL APPEALS.**

     A.      Does this appeal involve review under 18. U.S.C. • 3742(a) or (b) of the sentence imposed? _____

     B.      If the answer to A (immediately above) is yes, does the defendant also challenge the judgment of conviction?_____

     C.      Describe the sentence imposed. _____
_____

     D.      Was the sentence imposed after a plea of guilty? _____

     E.      If the answer to D (immediately above) is yes, did the plea agreement include a waiver of appeal and/or collateral challenges?
_____

     F.      Is defendant on probation or at liberty pending appeal? _____

     G.      If the defendant is incarcerated, what is the anticipated release date if the judgment of conviction is fully executed?_____

     H.      Does this appeal involve the November 1, 2014 retroactive amendments to §§ 2D1.1 and 2D1.11 of the U.S. Sentencing Commission's Guideline Manual, which reduced offense levels for certain drug trafficking offenses?
_____

     **NOTE**:      In the event expedited review is requested and a motion to that effect is filed, the defendant shall consider whether a transcript of any portion of the trial court proceedings is necessary for the appeal. Necessary transcripts must be ordered by completing and delivering the transcript order form to the clerk of the district court with a copy filed in the court of appeals.

## VI.   ATTORNEY FILING DOCKETING STATEMENT:

Name**:**   David C. Shilton                      Telephone:   (202) 514-5580

Firm:   United States Department of Justice, Environment & Natural Resources Division, Appellate Section

Email Address:  david.shilton@usdoj.gov

Address:   P.O. Box 7415, Washington  DC  20044

_____

_____

## PLEASE IDENTIFY ON WHOSE BEHALF THE DOCKETING STATEMENT IS FILED:

A.     X     Appellant

Petitioner

Cross-Appellant

B.     **PLEASE IDENTIFY WHETHER THE FILING COUNSEL IS**

Retained Attorney

Court-Appointed

X     Employed by a government entity
        (please specify: U.S. Dept. of Justice                          )

Employed by the Office of the Federal Public Defender.


___s/ David C. Shilton_____     _June 12, 2015_____
Signature                                                      Date

X     Attorney at Law

NOTE:     A copy of the final judgment or order appealed from, any
            pertinent findings and conclusions, opinions, or orders, any
            motion filed under Fed. R. Civ. P. 50(b), 52(b), 59, or 60,
            including any motion for reconsideration, for judgment of
            acquittal, for arrest of judgment, or for new trial, and the
            dispositive order(s), any motion for extension of time to file
            notice of appeal and the dispositive order **must be submitted
            with the Docketing Statement.**

            The Docketing Statement must be filed with the Clerk via the
            court's Electronic Case Filing System (ECF).  Instructions and
            information regarding ECF may be found on the court's website,
            www.ca10.uscourts.gov.

            This Docketing Statement must be accompanied by proof of
            service.

            The following Certificate of Service may be used.

**CERTIFICATE OF SERVICE**

I hereby certify that on June 12, 2015, I electronically filed the foregoing using the Court's CM/ECF system which will send notification of such filing to the following:

Mr. Shiloh Silvan Hernandez
hernandez@westernlaw.org

Mr. Erik Schlenker-Goodrich
eriksg@westernlaw.org

Mr. Kyle James Tisdel
tisdel@westernlaw.org

Mr. Peter James McVeigh
peter.mcveigh@usdoj.gov

Mr. Paul Spruhan
pspruhan@nndoj.org

Mr. Paul E. Frye
pef@fryelaw.us

Mr. William Gregory Kelly
wgk@fryelaw.us

/s/ David C. Shilton
DAVID C. SHILTON
Attorney, U.S. Department of Justice
Environment & Natural Resources Division
P. O. Box 7415
Washington, DC 20044
(202) 514-5580

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 12-cv-01275-JLK

DINÉ CITIZENS AGAINST RUINING OUR ENVIRONMENT,
SAN JUAN CITIZENS ALLIANCE,
SIERRA CLUB,
CENTER FOR BIOLOGICAL DIVERSITY, AND
AMIGOS BRAVOS,

      Petitioners,

v.

UNITED STATES OFFICE OF SURFACE MINING RECLAMATION AND
ENFORCEMENT, an agency within the U.S. Department of the Interior;
SALLY JEWELL, in her official capacity as Secretary of the Interior;
AL KLEIN, in his official capacity as Regional Director of the U.S. Offices of Surface
Mining Reclamation and Enforcement, Western Region;
BOB POSTLE, in his official capacity as Manager of the Program Support Division for
the Western Region of the Office of Surface Mining Reclamation and Enforcement;
RICK WILLIAMSON, in his official capacity as Manager of the Indian Programs Branch
of the Western Region of the office of Surface Mining Reclamation and Enforcement;
and
MYCHAL YELLOWMAN, in his official capacity as Navajo Mine Team Leader in the
Office of Surface Mining Reclamation and Enforcement,

      Respondents, and

THE NAVAJO TRANSITIONAL ENERGY COMPANY, LLC

      Intervenor-Respondent.

---

## FINAL JUDGMENT

---

In accordance with the orders filed during the pendency of this case, and

pursuant to Fed. R. Civ. P. 58(a), the following Final Judgment is hereby entered.

Pursuant to and in accordance with the Order (Doc. No. 83) entered by Judge John

Kane on 4/6/2015, it is

ORDERED that Judgment on the Petition for review of Agency Action is entered in favor of Petitioners and against Respondents.  It is

FURTHER ORDERED that OSM's EA/FONSI and its approval of NTEC's Permit Revision Application should be VACATED, pending OSM's compliance with NEPA, and REMANDED to OSM for further proceedings consistent with the  Memorandum Opinion And Order (Doc. No. 79) entered on 3/2/2015 .  It is

FURTHER ORDERED that any petition by Petitioners for attorney fees and costs shall be submitted on or before 45 days (or the next business day should that day fall on a weekend or court holiday) from the date this order issues.

Dated at Denver, Colorado this 8th day of April, 2015.

FOR THE COURT:
JEFFREY P. COLWELL, CLERK


By:  s/   Bernique Abiakam
_____

Bernique Abiakam
Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge John L. Kane

Civil Action No.  12-cv-01275-JLK

DINÉ CITIZENS AGAINST RUINING OUR ENVIRONMENT,
SAN JUAN CITIZENS ALLIANCE,
SIERRA CLUB,
CENTER FOR BIOLOGICAL DIVERSITY, and
AMIGOS BRAVOS,

      Petitioners,

v.

UNITED STATES OFFICE OF SURFACE MINING RECLAMATION AND
ENFORCEMENT, an agency within the U.S. Department of the Interior;
SALLY JEWELL, in her official capacity as Secretary of the Interior;
AL KLEIN, in his official capacity as Regional Director of the U.S. Offices of Surface Mining
Reclamation and Enforcement, Western Region;
BOB POSTLE, in his official capacity as Manager of the Program Support Division for the
Western Region of the Office of Surface Mining Reclamation and Enforcement;
RICK WILLIAMSON, in his official capacity as Manager of the Indian Programs Branch of the
Western Region of the Office of Surface Mining Reclamation and Enforcement; and
MYCHAL YELLOWMAN, in his official capacity as Navajo Mine Team Leader in the Office
of Surface Mining Reclamation and Enforcement;

      Respondents, and

THE NAVAJO TRANSITIONAL ENERGY COMPANY, LLC

      Intervenor-Respondent

---

**ORDER**

---

Kane, J.

    In the antecedent to this Order, issued March 2, 2015, I concluded that the United States

Office of Surface Mining Reclamation and Enforcement ("OSM") violated the National

Environmental Policy Act ("NEPA"), by failing to consider adequately the environmental

impacts related to the combustion of coal that will be mined as a result of its approval of the

Navajo Transitional Energy Company's ("NTEC") Permit Revision Application in its

Environmental Assessment/Finding of No Significant Impact ("EA/FONSI") for NTEC's Permit

Revision Application.  Accordingly, I sustained Petitioners' challenge to OSM's EA/FONSI and

its approval of NTEC's Permit Revision Application, and I ordered the parties to confer in an

effort to reach an agreement with respect to the appropriate remedy.

      The parties have failed to reach an agreement as to the appropriate remedy.  In lieu of

such an agreement, the parties have presented briefs summarizing their arguments in support of

their proposed remedies.  Although the parties concur that remand to OSM is appropriate, they

disagree as to whether OSM's EA/FONSI and its approval of NTEC's Permit Revision

Application should be vacated pending OSM's compliance with NEPA.

      Petitioners argue that I should vacate OSM's EA/FONSI and OSM's approval of NTEC's

Permit Revision Application.  They urge that vacatur is consistent with NEPA's purpose of

ensuring that federal agencies consider the environmental impacts of their actions before

undertaking any "major federal action."  They also argue that equitable factors counsel in favor

of remand with vacatur, because any prospective damage to OSM and NTEC would be relatively

minor and short-lived.

      The Federal Respondents and the Intervenor-Respondent argue that the appropriate

remedy is remand without vacatur.  These parties suggest that OSM's violation of NEPA, which

they assert is relatively minor, is outweighed by the potential disruption that would be caused if I

were to vacate OSM's EA/FONSI and its approval of the Permit Revision Application.

Specifically, they argue that vacatur would have a significant economic impact on the Navajo

Mine and the Navajo Nation, and that it could threaten the reliability of the region's power supply.

Based on the inherent jurisdictional authority of this court and upon consideration of my March 2, 2015, Memorandum Opinion and Order (Doc. 79), the parties' arguments regarding the appropriate remedy, and the entirety of the pleadings and arguments offered in this case, I rule for the reasons that follow that OSM's EA/FONSI and its approval of NTEC's Permit Revision Application are VACATED, pending OSM's compliance with NEPA, and REMANDED to the agency for further proceedings consistent with my March 2, 2015, Memorandum Opinion and Order.

*Principles Informing Determination of Appropriate Remedy*

When a federal agency fails to comply with its obligation to consider the environmental impacts of its action before undertaking a "major federal action," the normal remedy is vacatur. *See* 5 U.S.C. § 706(2) (directing courts to "set aside" agency action found to violate statutory obligations).  Nonetheless, courts retain equitable discretion to fashion an appropriate remedy, *see* 5 U.S.C. § 702 (preserving the power of courts to apply equitable factors in the remedies analysis), and in some cases equitable principles counsel in favor of remand without vacatur. *See*, *e.g.*, *Pac. Rivers Council v. U.S. Forest Serv.*, 942 F. Supp. 2d 1014, 1021 (E.D. Cal. 2013).

Although the Tenth Circuit has not specifically addressed the factors to be considered in determining whether vacatur is an appropriate remedy, other courts have adopted a balancing test, which weighs the seriousness of the deficiencies in the completed rule-making and the doubts the deficiencies raise about the validity of the agency's ultimate decision against the harm that might arise from vacating the agency's action.  *See*, *e.g.*, *Allied-Signal, Inc. v. NRC*, 988 F.2d 146, 150-51 (D.C. Cir. 1993); *Cal. Communities Against Toxics v. U.S. EPA*, 688 F.3d 989,

992 (9th Cir. 2012).  Although these decisions do not limit or define my exercise of discretion in this case, I find them persuasive, and I use this framework as a starting point for my determination of the appropriate remedy for OSM's violation of NEPA.

DISCUSSION

*Deficiencies in Rulemaking*

In its EA/FONSI for NTEC's proposed expansion of its mining operations, OSM failed to discuss the mercury-related indirect effects of NTEC's proposed expansion.  Nonetheless, Respondents argue that this deficiency "does not raise serious doubts" about OSM's analysis and approval of NTEC's Permit Revision Application.  Respondents' Remedies Brief (Doc. 80) at 3-4.  In support of this argument, they attempt to distinguish the findings of a 2009 Draft Biological Opinion, which was included in the Administrative Record and upon which I relied in finding that OSM violated NEPA in approving NTEC's Permit Revision Application.  Respondents argue that because the decision analyzed in the 2009 Draft Biological Opinion is demonstrably different than the decision analyzed in the EA for the Permit Revision Application, the findings of the 2009 Draft Biological Opinion are inapplicable.  *Id*. at 4.  They also argue that the 2009 Draft Biological Opinion is inapplicable because it fails to take into account the EPA's 2012 regulation addressing national mercury emissions.  *Id*. at 5.  Given these factors, Respondents suggest that "it is likely that OSM will be able to substantiate its finding of no significant impact on remand."  *Id*. at 5.

Notwithstanding Respondents' and Intervenor-Respondent's arguments to the contrary, I determine that this deficiency does indeed raise serious doubts about the validity of OSM's EA/FONSI and its approval of NTEC's Permit Revision Application.  Based on the record before the agency at the time it issued this EA/FONSI, it is apparent that these mercury-related

indirect effects could have significant impacts on threatened and endangered species in the area impacted by the Four Corners Power Plant, *see* AR 1-2-14-1990.  It is also apparent that, on remand, OSM's consideration of these impacts could provide ample basis for denial of NTEC's Permit Revision Application.  *See* 30 C.F.R. § 773.15.  Accordingly, I conclude that this factor weighs in favor of vacatur.

*Harm that Might Arise from Vacatur*

Respondents and Respondent-Intervenor argue that the potential economic harm of vacatur outweighs the deficiencies in OSM's EA/FONSI for the Permit Revision Application. They argue that vacatur could result in significant impacts to both NTEC and the Navajo Nation, and suggest that vacatur of the decision approving the 830-acre expansion could ultimately lead to the closure of the Navajo Mine and the Four Corners Power Plant.

Intervenor-Respondent has demonstrated that vacatur would cause some economic harm. If OSM's approval of NTEC's expansion is vacated, it will cost NTEC approximately $ 400,000 per month to alter its mining operations to meet its contractual obligations to supply coal to the Four Corners Power Plant.  *See* Declaration of Shawn D. Goeckner (Doc. 82-3) at ¶ 18.  This expense is not insignificant, and, depending on the length of time it would take OSM to remedy its NEPA violation on remand, the expense could be quite sizeable.

Nonetheless, I conclude that this prospective economic harm does not outweigh the doubts concerning the validity of OSM's actions that are raised by the deficiencies in OSM's EA/FONSI and its approval of NTEC's Permit Revision Application.  As a threshold matter, it is important to note that the responsibility for such delay and expense lies with Respondents and not with Petitioners.  Furthermore, notwithstanding their conclusory statements to the contrary, neither Respondents nor Respondent-Intervenor have demonstrated that vacatur is likely to

5

ultimately lead to the closure of the Navajo Mine or the Four Corners Power Plant. Even if I were to vacate OSM's approval of NTEC's Permit Revision Application, NTEC will be able to meet its continuing contractual obligation to supply coal to the Four Corners Power Plant through July of 2016. *Id*. at ¶ 16. *See also* AR 1-2-11-189 to -190. Furthermore, OSM is not foreclosed from re-approving NTEC's proposed expansion into Area IV North after it has fully complied with its obligation to consider the reasonably foreseeable potential environmental impacts of the proposed expansion.

Finally, if, as Respondents suggest, the deficiencies in OSM's FONSI and permit approval are in fact easily correctible, the length of any delay in mining in Area IV north should be relatively short. As both Petitioner and Intervenor-Respondent note, OSM may be able to comply with NEPA in regards to its obligations relating to its consideration of NTEC's Permit Revision Application by tiering to a pending, and soon to be completed, comprehensive EIS for the Navajo Mine and the Four Corners Power Plant.

### *Other Factors*

A number of other factors influence my determination of the appropriate remedy for OSM's violation of NEPA. First, I am mindful of NEPA's purpose of ensuring that federal agencies meaningfully consider the potential environmental impacts of a proposed action <u>before</u> undertaking that action. *See* 40 C.F.R. § 1506.1(a)-(b); 42 U.S.C. § 4332(C)(v). Remand alone will not fulfill NEPA's purpose. Absent some limitation on NTEC's ability to continue its operations while OSM corrects its NEPA violation, OSM's compliance with NEPA could become a mere bureaucratic formality.

Furthermore, if NTEC's operations continue unabated, a significant additional amount of coal will be extracted and combusted over the term of NTEC's coal supply contract. AR 1-2-11-

285.  The cumulative effects of that combustion, which would not occur but for OSM's approval

of NTEC's Permit Revision Application, endanger public health and the environment.  *See*

Petitioners' Remedies Brief (Doc. 81) at 7-10.[1]

Finally, there is an important interest in "encouraging tribal self-sufficiency and

economic development."  *California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 216

(1987).  There is, however, a significant countervailing interest in ensuring OSM's compliance

with NEPA.  *See, e.g.*, *Davis v. Mineta*, 302 F.3d 1104, 1116 (10th Cir. 2002).  Accordingly, the

public interest in continued mining is balanced by the public interest in ensuring OSM's

compliance with NEPA.

CONCLUSION

After considering and weighing all of these interests, I conclude that OSM's EA/FONSI

and its approval of NTEC's Permit Revision Application should be VACATED, pending OSM's

compliance with NEPA, and  REMANDED to OSM for further proceedings consistent with my

March 2, 2015, Memorandum Opinion and Order.

Furthermore, any petition by Petitioners for attorney fees and costs shall be submitted on

or before 45 days (or the next business day should that day fall on a weekend or court holiday)

from the date this order issues.  IT IS SO ORDERED.

Dated:  April 6, 2015                                                BY THE COURT:

                                                                     s/ John L. Kane
                                                                     Senior U.S. District Court Judge

---

[1] Intervenor-Respondent argues that an injunction will not offer Petitioners any meaningful relief, because the Four Corners Power Plant will continue to combust coal mined from Area III in the absence of a supply from Area IV North.  The environmental effects resulting from the combustion of coal mined from Area III are not, however, at issue here.  The environmental impacts of extracting and combusting an additional 12.7 million tons of coal to be mined from Area IV North form the basis of the instant controversy.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge John L. Kane

Civil Action No.  12-cv-01275-JLK

DINÉ CITIZENS AGAINST RUINING OUR ENVIRONMENT,
SAN JUAN CITIZENS ALLIANCE,
SIERRA CLUB,
CENTER FOR BIOLOGICAL DIVERSITY, and
AMIGOS BRAVOS,

        Petitioners,

v.

UNITED STATES OFFICE OF SURFACE MINING RECLAMATION AND
ENFORCEMENT, an agency within the U.S. Department of the Interior;
SALLY JEWELL, in her official capacity as Secretary of the Interior;
AL KLEIN, in his official capacity as Regional Director of the U.S. Offices of Surface Mining
Reclamation and Enforcement, Western Region;
BOB POSTLE, in his official capacity as Manager of the Program Support Division for the
Western Region of the Office of Surface Mining Reclamation and Enforcement;
RICK WILLIAMSON, in his official capacity as Manager of the Indian Programs Branch of the
Western Region of the Office of Surface Mining Reclamation and Enforcement; and
MYCHAL YELLOWMAN, in his official capacity as Navajo Mine Team Leader in the Office
of Surface Mining Reclamation and Enforcement;

        Respondents, and

THE NAVAJO TRANSITIONAL ENERGY COMPANY, LLC

        Intervenor-Respondent

---

**MEMORANDUM OPINION AND ORDER**

---

Kane, J.

        Despite hundreds of pages of briefing and a voluminous administrative record, this case

presents a relatively straightforward question:  must the Office of Surface Mining Reclamation

and Enforcement ("OSM") consider the environmental impacts related to the combustion, at the

Four Corners Power Plant, of coal that will be mined as a result of OSM's approval of the

Navajo Transitional Energy Company's ("NTEC") Permit Revision Application?  Because I

answer this question in the affirmative, and because I find that OSM failed to adequately

consider those same impacts in its Environmental Assessment ("EA") for NTEC's Permit

Revision Application, the Petition for Review of Agency Action (Doc. 1) is GRANTED.  The

balance of this opinion discusses the factual and legal basis for this conclusion.

## BACKGROUND

The Navajo Mine, which extracts coal from the Fruitland Formation, exists for the sole

purpose of supplying coal to the nearby Four Corners Power Plant.[1]  *See* AR 1-2-11-19; 1-2-11-

20.  In 1960, the original operator of the mine, BHP Navajo Coal Company ("BHP"),[2]

negotiated a contract with Arizona Public Service to provide coal to the Four Corners Power

Plant, which is located adjacent to the northern end of the mine.  AR 8-1-1-2264.  Coal has been

produced from the Navajo Mine since 1963, solely for use at the Four Corners Power Plant.  AR

8-1-1-2264; AR 2-1-1-2542.

Operations at the mine are governed by a life-of-mine permit issued by OSM.  AR 2-1-1-

922.  Although the initial permit was limited to a term of five years, 30 U.S.C. § 1256(b), NTEC

can apply for successive five-year renewals, with respect to areas within the boundaries of its

---

[1]  For a more extensive discussion of the development and permitting history of the Navajo
Mine, see *Diné Citizens Against Ruining Our Environment v. Klein*, 747 F. Supp. 2d 1234, 1239-
1242 (D. Colo. 2010).

[2]  From the mine's inception in 1957 until 2013, the mine was leased from the Navajo Nation by
a series of private, non-tribal entities.  At the time of the challenged Permit Revision Application,
the mine was leased by BHP Navajo Coal Company ("BHP").  On December 30, 2013, BHP
changed its name to Navajo Mine Coal Company ("NMCC"), and BHP sold 100% of its interests
in NMCC to the Navajo Transitional Energy Company ("NTEC").  On January 6, 2014, NMCC
was merged into NTEC.  Because NTEC has assumed BHP's interest in the mine, I refer to
NTEC when discussing the current rights and obligations relating to the Navajo Mine.  Where
necessary for the sake of historical accuracy, however, I refer to BHP.

existing permit, as a matter of right. *Id.* § 1256(d)(1). Such "matter of right" renewals are not, however, allowed when NTEC seeks to extend its mining operations "beyond the boundaries authorized in the existing permit." *Id.* § 1256(d)(2). When NTEC seeks to expand its mining operations, it must submit a permit revision application, which is "subject to the full standards applicable to new applications under [the Surface Mining Control and Reclamation Act]." *Id.*; *see also* AR 1-2-11-22. OSM's compliance, vel non, with NEPA in regard to its approval of NTEC's recent Permit Revision Application, which presents the latest chapter in the ongoing attempt to expand operations at the Navajo Mine, forms the basis of the instant controversy.

PROCEDURAL HISTORY

BHP first sought to expand mining operations into a 3,800 acre area of the Navajo Mine known as "Area IV North" in 2005. OSM completed an EA for the Permit Revision Application, determined that the expansion of operations proposed therein would have no significant impact on the quality of the human environment, and approved the Permit Revision Application on October 7, 2005.

Soon after, two of the Petitioners in the instant action, Diné Citizens Against Ruining our Environment ("DCARE") and San Juan Citizens Alliance, filed suit challenging OSM's approval of BHP's proposed expansion of operations into Area IV North. In October 2010, I reviewed and rejected OSM's approval of the Permit Revision Application, remanding the application to OSM for further proceedings. *See Diné Citizens Against Ruining Our Environment v. Klein*, 747 F. Supp. 2d 1234 (D. Colo. 2010).

Following my 2010 remand, BHP submitted a revised Permit Revision Application to OSM, seeking permission for a more modest expansion of its operations into Area IV North. AR 1-01-01-01. OSM developed a draft EA reviewing the potential environmental impacts of the

3

expansion of operations proposed in the Permit Revision Application; it solicited extensive

public input on that draft EA; and it issued a final EA determining that the revised proposed

expansion would have no significant impact on the human environment.  AR 1-02-10-01 to 06.

Based in part on that determination, OSM approved the 2011 Permit Revision Application with

conditions.  AR 1-02-10-01.

       Shortly thereafter, DCARE, San Juan Citizens Alliance, Sierra Club, Center for

Biological Diversity, and Amigos Bravos (collectively "Petitioners") filed the instant suit

alleging that OSM's EA failed to comply with the National Environmental Policy Act ("NEPA")

and its implementing regulations.  Specifically, Petitioners argue that OSM should have

considered the environmental impacts related to the combustion of coal that will be mined as a

result of OSM's approval of NTEC's Permit Revision Application and the environmental

impacts of the disposal of the resultant coal combustion waste (collectively "combustion-related

impacts").

       On January 10, 2014, the parties completed their briefing on Petitioners' claims, and on

February 18, 2015, they presented oral arguments.  This matter is now ready for disposition.

JURISDICTION AND VENUE

       Because Petitioners' claims are based on NEPA, I have jurisdiction pursuant to 28 U.S.C.

§ 1331.  Venue in this court is proper, because a substantial part of the events giving rise to

Petitioners' claims occurred in OSM's Western Region offices located in Denver, Colorado.  28

U.S.C. § 1391(e).

4

JUSTICIABILITY

*Standing*

Respondents do not contest Petitioners' standing to challenge their approval of NTEC's

Permit Revision Application;[3] nonetheless, I must still consider the issue of standing *sua sponte*

to ensure that I have subject-matter jurisdiction.  *See S. Utah Wilderness All. v. Office of Surface*

*Mining Reclamation and Enforcement*, 620 F.3d 1227, 1233 (10th Cir. 2010).  To establish that

they have standing to challenge OSM's approval of NTEC's Permit Revision Application,

Petitioners must show that: (1)  they suffered or imminently will suffer an injury; (2) that injury

is fairly traceable to the challenged conduct of Respondents; and (3) a favorable federal court

decision is likely to redress the injury.[4]  *See, e.g.*, *Bennett v. Spear*, 520 U.S. 154, 167 (1997).

Furthermore, because Petitioners are organizations, they must demonstrate that "(a) [their]

members would otherwise have standing to sue in their own right; (b) the interests [they] seek[]

to protect are germane to [their organizational] purpose; and (c) neither the claim asserted nor the

relief requested requires the participation of individual members in the lawsuit."  *Comm. to Save*

*the Rio Hondo v. Lucero*, 102 F.3d 445, 447 n.3 (10th Cir. 1996).  Because the second and third

prongs of the organizational standing inquiry are readily established in this case,[5] the balance of

---

[3]  Intervenor-Respondent BHP, NTEC's predecessor in interest, cursorily challenges Petitioners' standing, arguing in a footnote that Petitioners' complained-of injury is neither "fairly traceable" to OSM's approval of the proposed expansion nor redressable by a decision of this Court.  I address these arguments *infra*.

[4]  The Supreme Court has also imposed a variety of prudential standing requirements, none of which is implicated here.

[5]  DCARE, San Juan Citizens Alliance, Sierra Club, Center for Biological Diversity, and Amigos Bravos are non-profit, member-based groups dedicated to the protection and preservation of the environment.  The interest implicated in this controversy, ensuring OSM's compliance with NEPA, is germane to their organizational purpose.  Furthermore, neither the claim they assert nor the relief they seek requires the participation of their individual members.

my standing inquiry focuses on whether Petitioners' members would have standing to challenge

OSM's approval of NTEC's Permit Revision Application in their own right.

1.   Injury in Fact

Petitioners assert that OSM has failed to comply with its obligation to fully consider the

potential environmental impacts that would result from OSM's approval of NTEC's Permit

Revision Application.  A violation of NEPA's procedural requirements constitutes harm for

purposes of Article III standing.  *See, e.g.*, *Davis v. Mineta*, 302 F.3d 1104, 1115 (10th Cir.

2002).  Furthermore, DCARE, San Juan Citizens Alliance, Sierra Club, Center for Biological

Diversity, and Amigos Bravos assert that their members live, work, raise families, recreate,

conduct scientific research, and follow their religious faith in the area impacted by the

challenged action, and they "will continue to do so in the future and on an ongoing basis."

Petition for Review (Doc. 1) at ¶ 25.  *See also* Declaration of Dailan Jake Long (Doc. 48-1);

Declaration of Lucy A. Willie (Doc. 48-2); Declaration of Taylor McKinnon (Doc. 48-3);

Declaration of Mike Eisenfeld (Doc. 48-4); Declaration of Sarah Jane White (Doc. 48-5); and

Declaration of Shirley McNall (Doc. 48-6). These allegations and supporting declarations

sufficiently demonstrate the concrete harm caused to Petitioners' members by OSM's alleged

violations of NEPA, as well as the likelihood of future injury to Petitioners' members resulting

from those alleged violations.[6]  *See Summers v. Earth Island Inst.*, 588 U.S. 488, 498 (2009) (an

---

[6]  Although Petitioner Amigos Bravos failed to submit a declaration specifically alleging facts in
support of its standing to bring the instant claim, that failure is of no consequence.   Because I
have determined that DCARE, San Juan Citizens Alliance, Sierra Club, and Center for
Biological Diversity have standing to challenge OSM's approval of NTEC's proposed
expansion, I need not determine whether Amigos Bravos has standing.  *See Utah v. Babbitt*, 137
F.3d 1193, 1215 n.36 (10th Cir. 1998) (noting that it is unnecessary to consider standing of other
plaintiffs when one plaintiff has adequately established standing).

organization must "make specific allegations establishing that at least one identified member ha[s] suffered or w[ill] suffer harm"); *Wilderness Soc'y v. Kane Cnty.*, 581 F.3d 1198, 1211 (10th Cir. 2008) (finding similar declarations sufficient to establish injury-in-fact).

2. <u>Causation</u>

Petitioners must also "show [their] injuries are fairly traceable to the conduct complained of." *Comm. to Save the Rio Hondo*, 102 F.3d at 451. Where a party asserts a NEPA claim, "the injury is the increased risk of environmental harm to concrete interests, and the conduct complained of is the agency's failure to follow the National Environmental Policy Act's procedures." *Id.* Therefore, in order to establish causation, "a [party] need only show its increased risk is fairly traceable to the agency's failure to comply with the National Environmental Policy Act." *Id.*

The harm forming the basis of Petitioners' "injury" for purposes of the standing analysis is the inadequate foresight and deliberation inherent in OSM's alleged NEPA violations. It follows that this injury was directly caused by OSM's alleged failure to comply with NEPA's procedural requirements.[7] Because they have adequately pled the causal connection between OSM's complained of conduct and their alleged injury, Petitioners have established causation for purposes of Article III standing.

---

[7] Intervenor-Respondent BHP, NTEC's predecessor in interest, suggests that the combustion-related impacts themselves, and not OSM's failure to consider the combustion-related impacts, are the injury upon which Petitioners' standing is based. This argument misapprehends the nature of Petitioners' harm, which is predicated on the procedural harm inherent in a NEPA violation. Accordingly, Intervenor-Respondent's related arguments that Petitioners have failed to demonstrate causation and redressability are without merit.

3. <u>Redressability</u>

An injury is redressable when "it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  *Friends of the Earth v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 181 (2000).  Petitioners must demonstrate a substantial likelihood that OSM's compliance with NEPA will redress their alleged injury.  *See Catron Cnty. Bd. of Comm'rs*, 75 F.3d at 1433; *S. Utah Wilderness Alliance*, 620 F.3d at 1235 (finding a procedural injury would be redressed by forcing agency to follow proper procedures).

Petitioners' complained-of injury is directly related to OSM's alleged failure to comply with NEPA's procedural requirements.  They seek declaratory judgment that OSM has violated NEPA and the APA, an injunction setting aside OSM's approval of the Permit Revision Application and remanding the matter to OSM with instructions to prepare an Environmental Impact Statement, and a mandatory permanent injunction prohibiting OSM from permitting any ground-disturbing activity in Area IV North of the Navajo Mine until OSM remedies the complained-of NEPA violations.  If I were to grant the requested relief, the alleged NEPA violations would be corrected and Petitioners' harms would be redressed.[8]  Accordingly, I find that Petitioners have sufficiently demonstrated "redressability" for purposes of Article III standing, and that they have Article III standing to challenge OSM's approval of NTEC's Permit Revision Application.

*Prudential Mootness*

Although Petitioners have established their standing to bring these claims, I may not address these issues if this case is constitutionally or prudentially moot.  Neither Respondents

---

[8]  See *supra* note 7.

8

nor Intervenor-Respondent suggest that this case is constitutionally moot; instead, they urge me

to exercise my discretion to find Petitioners' challenge prudentially moot.  They argue that

because a pending EIS analyzes the combustion-related effects Petitioners claim OSM failed to

analyze in the 2012 EA, Petitioners challenge to the 2012 EA is prudentially moot.

*Supplemental Brief of the Navajo Transitional Energy Co.* (Doc. 76) at 8.

 "In deciding whether a case is moot, the crucial question is whether granting a present

determination of the issues offered will have some effect in the real world."  *Abdulhaseeb v.*

*Calbone*, 600 F.3d 1301, 1311 (10th Cir. 2010) (quoting *Kan. Judicial Review v. Stout*, 562 F.3d

1240, 1246 (10th Cir. 2009)).  In other words, "When it becomes impossible for a court to grant

effective relief, a live controversy ceases to exist, and the case becomes moot."  *Id.*  Respondent

and Intervenor-Respondent urge that, given the imminent completion of the pending EIS, I

cannot grant Petitioners meaningful relief.  I find this contention meritless.

Even if, as Respondents and Intervenor-Respondent argue, a remand to OSM with

instructions to prepare an EIS would not afford Petitioners any meaningful relief at this

juncture,[9]  Petitioners also seek an injunction prohibiting OSM from permitting any ground-

disturbing activity in Area IV North until OSM remedies its NEPA violations.  Complaint for

Declaratory and Injunction Relief and Petition for Review of Agency Action (Doc. 1) at 22.

Should I rule in Petitioners' favor, mining activities in Area IV North could be ceased until OSM

demonstrates that it has complied with its NEPA obligations.  This relief, even if temporary, is

meaningful.  Accordingly, I decline the invitation to exercise my discretion to find Petitioners'

challenge prudentially moot.

---

[9]  This contention is, at best, arguable.  Even if the pending EIS addresses many of the alleged
shortcomings in the 2012 EA, it would not actually cure OSM's failure to fully consider the
environmental impacts of NTEC's proposed expansion before OSM approved the expansion.

STANDARD OF REVIEW

NEPA does not define or specify the standard of review to be used in examining OSM's

actions.  Accordingly, the Administrative Procedure Act, 5 U.S.C. § 500, *et seq.*, provides the

framework for this appeal, and I must apply the standards articulated in the APA in considering

the merits of Petitioners' arguments.

Under the APA, I review OSM's actions to determine if they are "arbitrary, capricious,

an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  An

agency's action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance

with law" if "the agency entirely failed to consider an important aspect of the problem, offered

an explanation for its decision that runs counter to the evidence before the agency, or is so

implausible that it could not be ascribed to a difference in view or the product of agency

expertise." *Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins.* Co., 463 U.S. 29, 41

(1983); *see also Morris v. U.S. Nuclear Reg. Comm'n*, 598 F.3d 677, 690-91 (10th Cir. 2010).  In

the context of Petitioners' NEPA claim, I review the administrative record to "ensure that the

agency has adequately considered and disclosed the environmental impact of its actions and that

its decision is not arbitrary and capricious."  *Krueger*, 513 F.3d at 1178 (citing *Utah Shared*

*Access Alliance v.  U.S. Forest Serv.*, 288 F.3d 1205, 1208 (10th Cir.  2002)).

Although my review of OSM's approval of NTEC's Permit Revision Application is

"highly deferential," my "inquiry must be "searching and careful."  *Ecology Center, Inc. v. U.S.*

*Forest Serv.*, 451 F.3d 1183, 1188 (10th Cir. 2006).  I will uphold OSM's approval "if at all, on

the basis articulated by the agency itself," *Biodiversity Conserv. All. v. Jiron*, 762 F.3d 1036,

1060 (10th Cir. 2014); counsel's post-hoc rationalizations cannot substitute for the "fair and

Appellate Case: 15-1126  Document: 01019443939  Date Filed: 06/12/2015  Page: 28

considered judgment of the agency" as set forth in the administrative record. *S. Utah Wilderness All.*, 620 F.3d at 1236.

Having resolved these preliminary matters, I now turn to a substantive discussion of the basis for my decision.

## DISCUSSION

As a major federal action,[10] OSM's approval of NTEC's Permit Revision Application is subject to NEPA's procedural requirements. Accordingly, OSM was required to consider, and to inform the public that it had considered, the environmentally significant aspects of NTEC's Permit Revision Application. *Citizens' Comm. to Save Our Canyons v. Krueger*, 513 F.3d 1169, 1177-78 (10th Cir. 2008). OSM was not required to reach any specific substantive result, but it was required to prepare an Environmental Impact Statement ("EIS"), an Environmental Assessment ("EA"), or a Categorical Exclusion explaining the potential impact on the environment, or lack thereof, of NTEC's proposed mine expansion. *See, e.g.*, *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989); *Utah Envtl. Cong. v. Bosworth*, 443 F.3d 732, 736 (10th Cir. 2006).

In an effort to fulfill this obligation, OSM prepared an EA containing information relating to the need for the proposed expansion, other alternatives, the environmental impact of the proposed expansion and its alternatives, and a listing of agencies and persons consulted. *See* 40 C.F.R. § 1508.9(b). Petitioners challenge the scope of that EA, and they challenge OSM's conclusion that its approval of NTEC's Permit Revision Application will not have a significant impact on the environment. I address each argument *seriatim*.

---

[10]  Neither party contests that OSM's approval of the Permit Revision Application constitutes "major Federal action." For a definition of this term, *see* 40 C.F.R. § 1508.18.

*The Scope of OSM's EA for NTEC's Proposed Mine Expansion*

To determine the proper scope of its EA for NTEC's proposed mine expansion, OSM was required to consider "3 types of actions, 3 types of alternatives, and 3 types of impacts." 40 C.F.R. § 1508.25.  Most relevant to the instant challenge, OSM was required to consider "connected actions" and "indirect effects"[11] of the expansion of operations proposed in NTEC's Permit Revision Application.[12]  *Id.*

Petitioners argue that OSM improperly limited the scope of its EA by failing to consider the combustion-related impacts of the proposed expansion of operations.  Specifically, they argue that the combustion-related impacts of the proposed expansion require analysis as either "connected actions" or "indirect effects" of the proposed expansion.  Because I conclude that the combustion-related impacts are "indirect effects of the proposed action," I find it unnecessary to reach the parties' arguments relating to whether or not the continued operation of the Four Corners Power Plant is a "connected action."  *See Valley Forge Ins. Co. v. Health Care Mgmt. Partners, Ltd.*, 616 F.3d 1086, 1094 (10th Cir. 2010) ("Judicial restraint . . . means answering only the question we must, not those we can").

---

[11]  Although the CEQ regulations refer to "impacts" in their definition of the proper scope of an EA, the regulations make clear that "effects and impacts as used in these regulations are synonymous."  40 C.F.R. § 1508.8.

[12]  While the CEQ regulations do not specifically address how an agency is to determine the appropriate scope of an EA, some guidance may be found in the provisions relating to the scope of an EIS.  This conclusion logically follows from the fact that the EA forms the basis for determining whether an EIS is or is not necessary. If an EA is to serve this purpose, it must be similar in scope to the potential EIS. *See Citizens' Comm. to Save Our Canyons,* 297 F.3d at 1028 n. 13; *see also Klamath–Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.,* 387 F.3d 989, 998 (9th Cir.2004) (finding that "the CEQ regulations implementing NEPA require that an agency consider connected actions and cumulative actions within a single *EA or EIS.*" (emphasis in original) (quotations omitted)).

*Indirect Effects*

Petitioners argue that the combustion-related impacts must be analyzed as an "indirect effect" of NTEC's proposed mine expansion.  An "indirect effect" is an effect "which [is] caused by the action and [is] later in time or farther removed in distance, but [is] still reasonably foreseeable."  40 C.F.R. § 1508.8(a).  Accordingly, Petitioners must demonstrate both that (1) "but for" the proposed expansion, the coal combustion-related impacts would not occur and (2) the coal combustion-related impacts are reasonably foreseeable.  *Id.*; *see also Utahns for Better Transp. v. U.S. Dep't of Transp.*, 305 F.3d 1152, 1176 (10th Cir. 2002).

The Navajo Mine and the Four Corners Power Plant are unusually interconnected; indeed, as Petitioners argue, they are interdependent.  The Four Corners Power Plant is a mine mouth plant, which was "designed and constructed specifically to burn coal from the Navajo Mine."  AR 1-2-11-20.  The coal mined at the Navajo Mine is hauled from the mining areas to stockpiles adjacent to the railroad; it is transferred from the stockpiles to train cars; and it is transported to the crushing and blending facilities adjacent to the Four Corners Power Plant.  AR 1-2-11-40.  The coal mined from the Navajo Mine is delivered exclusively to the Four Corners Power Plant, AR 8-1-1-2264, and it is not economically feasible for the Four Corners Power Plant to secure coal from any other source.  AR 1-2-11-294 to -295.  *See also* AR 2-1-1-2542 ("the Navajo Mine is the sole supplier of fuel to the [Four Corners Power Plant]").

Under the existing Mine Plan, NTEC will be unable to meet its contractual obligations as the exclusive fuel source for the Four Corners Power Plant . AR 1-2-11-285.  Accordingly, the proposed expansion is necessary if NTEC is "to continue to provide a coal supply in accordance with [its] contractual obligations with the [Four Corners Power Plant] through July 6, 2016."  AR 1-2-11-28.  *See also* AR 1-2-11-22, AR 1-2-11-24, AR 1-2-11-29, AR 1-2-11-270, and AR 1-2-

11-276.  Significantly, if NTEC expands its operations as proposed, an additional 12.7 million tons of coal will be burned over the term of the coal supply contract.  AR 1-2-11-285.  In other words, as Respondents themselves concede, "but for [OSM's] approval of the permit revision application, coal would not be mined from Area IV North and the environmental impacts associated with the combustion of the mined coal would not occur."  Respondents' Brief (Doc. 53) at 36.

Furthermore, given the extreme interdependence of the Navajo Mine and the Four Corners Power Plant, Respondents concede that the combustion-related effects are reasonably foreseeable.  Transcript of Oral Argument (Feb. 18, 2015) at 36.  Unlike a scenario in which a coal mine markets its coal freely to multiple buyers, each of whom uses that coal in different applications under different constraints, there is virtually no uncertainty regarding when, where, and how the coal mined as a result of NTEC's proposed mine expansion will be combusted.[13] All of the coal mined from Area IV North will be combusted at the Four Corners Power Plant. Transcript of Oral Argument (Feb. 18, 2015) at 54.  Because there is no uncertainty as to the location, the method, or the timing of this combustion, it is possible to predict with certainty the combustion-related environmental impacts.  Accordingly, I find that the coal combustion-related impacts of NTEC's proposed expansion are an "indirect effect" requiring NEPA analysis.

In its EA for NTEC's Proposed Mine Expansion, OSM purported to analyze the impacts associated with NTEC's delivery of coal to the Four Corners Power Plant.  AR 1-2-11-22.  As Petitioners correctly note, however, OSM's analysis of the combustion-related impacts is extremely limited.  OSM's analysis primarily focuses on the impacts associated with mining and

---

[13]  Respondents note that pending regulations relating to the continued operation of the Four Corners Power Plant rendered uncertain the rate at which future combustion would occur, but they do not argue that this uncertainty made the combustion-related effects unforeseeable.

transporting coal to the Four Corners Power Plant.  OSM did, however, analyze and discuss emissions from the Four Corners Power Plant in the context of its cumulative effects analysis. As part of that analysis, OSM concluded that the proposed expansion, in conjunction with the continued combustion of coal at the Four Corners Power Plant and other major sources of ambient air pollution in the area, would have no "discernible impact to ambient air quality or to contribute to any cumulative effects on air quality in the [area of the proposed mine expansion]." AR 1-2-11-230.

Although this cursory, conclusory analysis leaves much to be desired, OSM was only required to discuss the combustion-related effects "to the extent necessary under the circumstances for evaluation of the project." *Wyoming v. U.S. Dep't of Agric.*, 661 F.3d 1209, 1251 (10th Cir. 2011).  With regard to the ambient air quality impacts resulting from the combustion of coal mined as a result of the proposed mine expansion, the EA's cumulative effects analysis justifies OSM's conclusion that the proposed expansion, and the concomitant combustion-related impacts, will not significantly affect ambient air quality in the region.  *See Border Power Plant Working Grp. v. Dep't of Energy*, 260 F. Supp. 2d 997, 1021 (S.D. Cal. 2003).

Petitioners also note, however, that OSM's EA for the proposed expansion completely fails to address the deleterious impacts of combustion-related mercury deposition in the area of the Four Corners Power Plant.  Nonetheless, Respondents argue OSM's minimal discussion of the combustion-related impacts, including its analysis of mercury pollution, was sufficient. Specifically, Respondents argue that OSM was not required to further discuss the combustion-related impacts of NTEC's proposed expansion because: (1) the proposed action did not change the status quo with regard to coal combustion at the Four Corners Power Plant; (2) further

15

consideration of the combustion-related impacts would have merely duplicated ongoing efforts of other governmental agencies; (3) OSM has little, if any, authority to address the combustion-related impacts; and (4) OSM is already in the process of analyzing the combustion-related impacts in a forthcoming EIS.  None of these arguments, either viewed separately or in combination with each other, justify OSM's failure to discuss the mercury-related indirect effects of NTEC's proposed expansion.[14]

1.  Status Quo

An EIS need not be prepared, nor "indirect effects" be considered, when "the proposed action does not significantly alter the status quo."  *Tri-Valley CARES v. DOE*, 671 F.3d 1113, 1125 (9th Cir. 2012).  Respondents argue that, even if OSM were to consider the combustion-related effects resulting from NTEC's proposed mine expansion, it would not be required to prepare an EIS, because the proposed expansion would not change the status quo with respect to the rate of coal combustion at the Four Corners Power Plant.

This argument ignores the relevant inquiry.  Even if the proposed expansion will not result in an increase to the rate of coal combustion at the Four Corners Power Plant, it will result in the combustion of an additional 12.7 million tons of coal over the term of the coal supply contract.  AR 1-2-11-285 (noting that without the proposed expansion into Area IV North, NTEC would fall short of its contractual obligations to the Four Corners Power Plant).  Absent OSM's approval of the proposed expansion, the environmental effects resulting from this additional combustion would not occur.

---

[14]  OSM's EA contains extremely limited discussion of mercury in the context of the impacts of the actual mining operations, but it does not discuss the mercury in the context of the continued operation of the Four Corners Power Plant.

A recent Ninth Circuit case illustrates the significance of this distinction.  In *South Fork Band Council of Western Shoshone of Nevada v. U.S. Department of Interior*, the court rejected BLM's argument that the "status quo rule" obviated the need to consider the indirect effects of a proposed mining expansion project.[15]  588 F.3d 718 (9th Cir. 2009).  In that case, BLM argued, as Respondents do here, that because the proposed expansion of mining operations would not result in any change in the rate of ancillary operations, it need not consider the effects of those ancillary operations in its NEPA analysis.  *Id*. at 725.  The Ninth Circuit flatly rejected this argument, noting that BLM's approval of the proposed mine expansion would result in an additional ten years of ancillary operations, along with the attendant environmental impacts.  *Id*. at 726.

This distinction is particularly relevant with regards to the deleterious impacts of combustion-related mercury deposition in the area of the Four Corners Power Plant.  Even though, as Respondents argue, the effects related to ambient air quality concentrations of pollutants are most closely related to the rate of emissions, Transcript of Oral Argument (Feb. 18, 2015) at 38-39, the primary impacts of mercury are not associated with its ambient concentration in the air but with its deposition from the atmosphere.  *Id*. at 42.  Although Respondents attempt to downplay the significance of mercury emissions from the Four Corners Power Plant, *id*. (noting that the Four Corners Power Plant accounts for 1% of mercury deposition in the San Juan River basin), the record reveals that even microscopic changes in the amount of mercury deposition can have significant impacts on threatened and endangered

---

[15]   At Oral Argument, Respondents attempted to distinguish *South Fork Band* based on the existence of a forty year-old environmental analysis for the Four Corners Power Plant and the fact that other agencies have regulatory authority over the coal combustion-related impacts.  Oral Argument Transcript (Feb. 18, 2015) at 45.  I find Respondents' attempt to distinguish this case unpersuasive.

species in the area impacted by the Four Corners Power Plant. *See* AR 1-2-14-1990 (concluding that a .1% increase in mercury deposition in the basin is likely to jeopardize the continued existence of the Colorado pikeminnow). Given the potentially significant impacts of mercury pollution, OSM's failure to discuss or analyze the deleterious impacts of combustion-related mercury deposition in the area of the Four Corners Power Plant is troubling. At a minimum, it renders OSM's analysis of the indirect effects of the proposed mine expansion insufficient.

OSM's approval of the Permit Revision Application, even if it does not alter the rate of combustion at Four Corners Power Plant, will result in the combustion of an additional 12.7 million tons of coal. The "status quo rule" does not excuse OSM's failure to consider the cumulative impact of this additional coal combustion, which would not occur but for OSM's approval of the proposed expansion.

2. Duplicative Analysis

Respondents argue that NEPA does not require analysis of the air quality and emission impacts of coal combustion at the Four Corners Power Plant, because such analysis "would have merely duplicated recent and ongoing efforts of EPA and the State of New Mexico." Respondent's Brief (Doc. 53) at 42. In support of this argument, Respondents cite EPA's development of Source-Specific Federal Implementation Plans for the Four Corners Power Plant and EPA's approval of the state of New Mexico's Air Quality Implementation Plan. These documents contain extensive analysis and discussion of the air quality impacts of coal combustion at the Four Corners Power Plant specifically, and in the Four Corners region generally. Respondents also cite EPA's development of National Emission Standards for

Regional Haze and for Mercury.[16]  These documents contain general discussions of the environmental impacts of ozone precursors and atmospheric mercury, but they do not discuss the particular impacts of such pollutants on the area surrounding the Four Corners Power Plant.

As a threshold matter, Petitioners argue that there is no evidence that OSM actually relied on these documents in the process of preparing its EA for the proposed mine expansion.  As Petitioners note, OSM failed to specifically refer to these documents in its EA or in its response to comments.  Moreover, OSM failed to follow any accepted procedures for either including as cooperating agencies the agencies responsible for these documents or for tiering to these documents.  I find Petitioners' argument on this point persuasive.

NEPA expressly allows for inter-agency cooperation, *see* 40 C.F.R. §§ 1506.2, 1506.3, and for reference and reliance upon other NEPA documents, *see* 40 C.F.R. §§ 1502.20, 1502.21. There is, however, no evidence in the administrative record indicating that OSM availed itself of these procedures.  OSM did not engage the EPA or the New Mexico Department of Environmental Quality as cooperating agencies, *see* AR 1-2-11-18 (listing cooperating agencies), and it did not list these documents in its list of other environmental studies it considered as part of its NEPA analysis.  *See* AR 1-2-11-25 (listing related environmental studies).  As Respondents themselves acknowledge, the EPA's regional haze rule was not finalized at the time of OSM's decision; OSM could not have incorporated that document into its EA.  Transcript of Oral Argument (Feb. 18, 2015) at 37.  Furthermore, OSM did not cite the EPA's mercury regulations in its EA or in its response to comments.  *Id*. at 52.  OSM's passing reference to these documents in the context of its cumulative impact analysis and its legal briefing cannot cure its

---

[16]  OSM did not cite either of these documents in the EA or in its response to comments. Transcript of Oral Argument (Feb. 18, 2015) at 17, 37, 52.

failure to meaningfully analyze and discuss the environmental impacts of NTEC's proposed

expansion.  *See Pennaco Energy, Inc. v. U.S. Dep't of Interior*, 377 F.3d 1147, 1159 (noting that

an agency's post hoc analysis does not satisfy NEPA).

Furthermore, even if OSM did rely on these documents in the process of preparing its EA

for the proposed mine expansion, OSM's failure to disclose in the EA its reliance on these

documents or to identify in the EA the EPA or the New Mexico Department of Environmental

Quality as cooperating agencies denied Petitioners, and the public at large, the opportunity to

review and comment on the adequacy of OSM's analysis of the impacts of the proposed mine

expansion.  OSM's failure to provide such notice and opportunity to comment runs afoul of

NEPA, which requires OSM to make information available to the public so that it "may also play

a role in both the decisionmaking process and the implementation of that decision."  *Robertson*,

490 U.S. at 349.

Finally, even if OSM had properly incorporated these documents into its EA, none of the

cited documents analyzes the impacts of mercury pollution from Four Corners Power Plant on

aquatic life in the San Juan River watershed.  Petitioners' Reply (Doc. 55) at 42.  As noted *supra*,

even miniscule changes in the rate and amount of mercury deposition can have significant

impacts on the environment surrounding the Four Corners Power Plant.  Nonetheless, OSM

failed to cite in its EA or in its response to comments any document analyzing the particular

impacts of mercury deposition resulting from the combustion of coal mined as a result of the

Area IV North expansion.[17]  *See* Transcript of Oral Argument (Feb. 18, 2015) at 52 (noting that

---

[17]  Although OSM prepared a Cumulative Hydrologic Impact Assessment ("CHIA"), which discussed mercury
pollution in the vicinity of the proposed expansion, Respondents themselves suggest that the analysis contained in
the CHIA is not directly relevant to the combustion-related impacts of the proposed expansion.  *See* Respondents'
Brief (Doc. 53) at 59.

"the mercury rule is not something that's cited in the EA or OSM's responses to comments").  In their briefing, Respondents cite to the EPA's promulgation of national mercury standards, but the post hoc citation to the generalized discussion of mercury impacts contained in this document cannot substitute for meaningful consideration of the particularized impacts of mercury deposition resulting from the combustion of coal mined as a result of the Area IV North expansion before OSM approved the proposed expansion.

3.  <u>Limited Authority to Address Combustion-Related Impacts</u>

Respondents argue that OSM was not required to consider the combustion-related impacts of the proposed mine expansion because OSM has "little, if any, authority to address the effects of emissions from the [Four Corners Power Plant]."  Respondents' Brief (Doc. 53) at 46. Specifically, Respondents note that BHP was not required to submit any information relating to the combustion-related impacts of its proposed mine expansion, and they note that OSM cannot impose any conditions on the operation of the Four Corners Power Plant.  *Id*. at 47-48.

These arguments, though legally correct, do not excuse OSM's obligation to consider the combustion-related impacts of the proposed mine expansion.  OSM is not required to consider the effects of an action that it "has no ability to prevent," *Dep't of Transp. v. Public Citizen*, 541 U.S. 752, 770 (2004); however, its regulations allow it to deny NTEC's proposed expansion if it determines that the expansion would "affect the continued existence of endangered or threatened species or result in destruction or adverse modification of their critical habitats, as determined under the Endangered Species Act of 1973."  30 C.F.R. § 773.15.  If OSM were to consider the combustion-related impacts and determine that they would affect the continued existence of endangered or threatened species, it would be required to deny NTEC's Permit Revision

Application.[18]  Because OSM has the authority to deny NTEC's Permit Revision Application based on its consideration of combustion-related effects, it was obligated to consider the combustion-related effects in its EA for the proposed expansion.

    4.  <u>Pending EIS</u>

Finally, Respondents argue that OSM's ongoing preparation of an EIS for the Navajo Mine and the Four Corners Power Plant obviates the need to analyze the combustion-related impacts of the proposed expansion.  This forthcoming EIS, which will "inform upcoming decisions on applications submitted by [NTEC] and other entities seeking, among other things, renewal of the life-of-mine permit, issuance of a new permit to authorize mining in additional areas covered by [NTEC's] existing lease, and authorization of continued operation of the FCPP," does not fulfill OSM's obligation to pause and consider the likely environmental impacts of NTEC's proposed expansion <u>before</u> approving the Permit Revision Application. *See Hillsdale Envtl. Loss Prevention, Inc. v. U.S. Army Corps of Eng'rs*, 702 F.3d 1156, 1166 (10th Cir. 2012).

*OSM's Finding of No Significant Impact*

Petitioners also argue that OSM should be required to complete an EIS for NTEC's Permit Revision Application.  Because OSM did not sufficiently consider the combustion-related effects of the proposed expansion in concluding that the proposed expansion will have no significant environmental impact, I think it proper to withhold my judgment, so that OSM can have an opportunity in the first instance to consider whether, in combination with the other impacts analyzed in its EA, these indirect effects will have a significant impact on the environment such that an EIS will be required.

---

[18]  As noted above, even miniscule increases in the amount of mercury deposition can have significant impacts on threatened and endangered species in the area impacted by the Four Corners Power Plant.

Appellate Case: 15-1126   Document: 01019443939   Date Filed: 06/12/2015   Page: 40

CONCLUSION

NEPA does not forbid an agency from engaging in environmentally destructive activities, it merely requires that the agency adequately consider the environmental impacts of its activities before committing resources to its chosen course of action.  Because OSM failed to adequately consider the reasonably foreseeable combustion-related effects of NTEC's proposed expansion of operations at the Navajo Mine, the Petition for Review of Agency Action is GRANTED.

In light of this decision and pursuant to the Joint Case Management Plan, the parties shall confer in an effort to reach an agreement with respect to the appropriate remedy.  If no agreement as to the appropriate remedy is reached, the parties shall submit no more than ten pages of briefing addressing the appropriate remedy no later than March 23, 2015.

Dated:  March 2, 2015                                          BY THE COURT:

                                                             s/ John L. Kane_____
                                                             Senior U.S. District Court Judge